IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JAMES WELDON,<br><br>Defendant. | CRIMINAL ACTION<br>NO. 25-58 |

# OPINION

**Slomsky, J.** **September 1, 2026**

## I. INTRODUCTION

In this case, Defendant James Weldon is charged with unlawfully possessing controlled substances, possessing a firearm by a felon, and possessing a firearm in furtherance of a drug trafficking crime. The charges arose from events on the night of December 11, 2024, when Philadelphia Police Department ("PPD") Officers were monitoring a high crime area in South Philadelphia. On a Real Time Crime Camera ("RTCC") positioned on a street poll, PPD Officers noticed Defendant standing outside a corner store located at the intersection of Greenwich and South 22nd Streets. The Officers saw Defendant, whom they knew to have prior felony convictions, in possession of a firearm. During the ensuing searches of Defendant, and there were several, the Officers recovered a holster, narcotics, $1,245 in cash, and a loaded semiautomatic pistol. Based on these events, Defendant was indicted on February 19, 2025 and charged with possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) (Count I); possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e) (Count II); and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count III).

Before the Court is Defendant's Motion to Suppress All Physical Evidence Recovered Pursuant to the Search and Seizure of Defendant, which was filed on April 30, 2026. (Doc. No. 21.) In the Motion, Defendant brings a Fourth Amendment challenge to the search of his person and the resulting seizure of the holster, narcotics, cash, and firearm, contending that the Officers lacked reasonable suspicion to search him. In its Response in Opposition, the Government argues that (1) the Officers had probable cause to arrest Defendant, which allowed them to search him incident to the arrest, (2) in the alternative, the Officers had reasonable suspicion to detain and search him, and (3) the physical evidence—even if unlawfully recovered during the search—inevitably would have been recovered through independent, lawful means.

On August 11, 2026, an evidentiary hearing was held on the Motion to Suppress, during which four PPD Officers who searched Defendant testified. The Motion to Suppress (Doc. No. 21) is now ripe for disposition.

## II. FINDINGS OF FACT

### A. The Street Camera Shows Defendant Possessing a Firearm

At the August 11, 2026 evidentiary hearing on the Motion to Suppress, the Court heard testimony from four PPD Officers—Officers John Smart, Mark Minissale, Patrick Fitzgibbon, and Dameen Holbrook (collectively, the "Officers")—and also watched footage recorded on the Real Time Crime Camera ("RTCC") and police body-worn cameras. The following facts were adduced from the testimony and the footage.

On the night of December 11, 2024, four officers in the PPD's South Division Violent Crime Reduction Team ("VCRT") were in their police vehicles monitoring the RTCC positioned at the intersection of Point Breeze Avenue and Cross Street in a high crime area known for shootings, robberies, and narcotics. (See Doc. No. 38, Suppression Hearing Transcript, August

11, 2026 ("Tr.") at 23–28, 99.) At 5:50 p.m., the RTCC—which was being remotely operated at different times by Officer Minissale and the Officers' supervisor—observed a Segway scooter outside a corner store located at the intersection of Greenwich and South 22nd Streets. (See Tr. at 31, 38.) Believing the scooter to be the same scooter reported as stolen nearby, one of the Officers zoomed in the RTCC. (Id. at 38, 41, 143.) Upon doing so, the Officers identified Defendant standing outside the corner store conversing with other men. (Id. at 38.)

At approximately 5:55 p.m., with the RTCC still zoomed in on the same corner, the Officers saw Defendant bend over. (Id. at 41.) When Defendant bent over, Officers noticed two exposed parts of a handgun on Defendant's waist: (1) an exposed grip, and (2) a rear-slide. (Id. at 44–45, 140–41, 160; see also Doc. No. 25, Exs. A–D.) A few seconds after bending over, Defendant pulled his clothes back over the exposed parts of the handgun to conceal them. (Tr. at 45; see also Doc. No. 25, Exs. E–F.)

**B. Officers' Prior Knowledge of Defendant**

Before seeing Defendant on the RTCC on December 11, 2024, at least two of the Officers who testified knew Defendant. Specifically, Officer Smart knew Defendant from his earlier assignment in the PPD's 17th district and his current assignment in the VCRT.[1] (Doc No. 25 at 3 n.3.) Additionally, "Officer Smart has interacted with the defendant on prior occasion[s] and is familiar with the defendant's criminal history, which includes convictions for felony possession with intent to deliver controlled substance . . . .". (Id.) Officer Smart testified that, on the night of Defendant's arrest, he knew Defendant had prior "narcotic[s] convictions" and that Defendant

[1] According to the body camera of several Officers, Defendant referred to Officer John Smart as "Smart" without Officer Smart providing his name to Defendant. (See, e.g., Tr. at 145; Doc. No. 25 at 6.)

was "6105 prior."[2] (Tr. at 39–40.) Officer Smart's partner, Officer Minissale, was also "familiar with the defendant, his criminal history, and the prohibition on a license to concealed [sic] carry a firearm status." (Doc No. 25 at 3 n.3.) Officer Minissale "observed and was present for" Defendant's prior arrest for narcotics, which led to a felony conviction, and "knew that [Defendant] was ineligible to carry a firearm."[3] (Tr. at 104.)

---

[2] Officer Smart was referring to 18 Pa.C.S. § 6105 (Section 6105), the Pennsylvania "statute for possession of a firearm by a felon or person prohibited." (Tr. at 40.) Section 6105 provides, in relevant part:

> (a) Offense defined.
> (1) A person who has been convicted of an offense enumerated in subsection (b), within or without this Commonwealth, regardless of the length of sentence or whose conduct meets the criteria in subsection (c) shall not possess, use, control, sell, transfer or manufacture or obtain a license to possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth.
>
> (c) Other persons. In addition to any person who has been convicted of any offense listed under subsection (b), the following persons shall be subject to the prohibition of subsection (a):
>
> > (2) A person who has been convicted of an offense under the act of April 14, 1972 (P.L. 233, No. 64), known as The Controlled Substance, Drug, Device and Cosmetic Act, or any equivalent Federal statute or equivalent statute of any other state, that may be punishable by a term of imprisonment exceeding two years.

18 Pa.C.S. § 6105. Defendant does not contest in this case that Section 6105 prevents him from possessing a firearm.

Moreover, as the Government contends, Defendant also violated 18 Pa.C.S. § 6106, which prohibits persons without a valid license from possessing concealed firearms outside of their home or business. (Doc. No. 25 at 13 & n.13) (citing 18 Pa.C.S. § 6106).

[3] On the night of December 11, 2024, Officer Minissale referred to Defendant by his first and last name without Defendant identifying himself. (Tr. at 113.)

### C. Officers Enter the Corner Store and Apprehend Defendant, Finding on Him an Empty Holster

Coupled with their familiarity of Defendant and his prior convictions, and Officers Smart and Minissale's observation of a firearm on Defendant's waist at 5:55 p.m. on December 11, 2024, they concluded that Defendant was unlawfully possessing a firearm. (Tr. at 46, 107.) Parked only a few blocks south of the corner store where Defendant was seen on the RTCC, Officers Smart and Minissale began driving north on 22nd Street. (Id. at 48.) As Officers approached the store in their vehicle, Defendant—looking south toward the Officers—walked inside the store. (Id.) At approximately 5:56 p.m., Officers Smart and Minissale exited their vehicle, and three additional uniformed officers on the VCRT arrived on the scene. (Id. at 48–49.) The Officers were on the scene to "arrest [Defendant] for firearms violations." (Id. at 49.)

When Officers Smart and Minissale entered the store, Defendant was behind the counter with the store clerk in a room that was locked from the main area of the store. (Id. at 52.) Once Officer Smart was "buzzed" in behind the counter, he and Officer Dameen Holbrook attempted to "take [Defendant] into custody, grab both of his arms [to place Defendant in handcuffs], and safely recover the firearm." (Id. at 53.) Officer Smart conducted an initial pat-down for the firearm, but only recovered the empty holster in the area on Defendant's body where he had previously seen the grip and rear-slide on the RTCC. (Id. at 54–55.) Meanwhile, Officer Minissale combed through the remainder of the store in the event Defendant had discarded it before the Officers arrived. (Id. at 55.)

### D. Officers Conduct a Second Search of Defendant, Finding Contraband

After Officer Smart secured Defendant in handcuffs, Officer Smart conducted a pat-down of Defendant, "reaching across the front of [Defendant's] body to his right side." (Tr. at 57–58.) At approximately 5:57 p.m., after Officer Smart asked Defendant about the location of the

firearm, Defendant responded that "it was in the back and then it was handed off to somebody." (Id. at 59.)

Resuming his pat-down, Officer Smart felt a "sandwich baggie" inside Defendant's front hoodie pocket that he "immediately" believed "was containing very tiny flip-top containers that are used to package crack cocaine." (Id. at 58.) At that point, Officer Smart "removed the sandwich baggie from Defendant's front pocket" that contained "purple and pinkish-tinted flip-top containers," which Officer Smart believed to be holding contraband. (Id. at 60.) Not wanting to risk contamination, Officer Smart placed the sandwich bag back into Defendants' hoodie pocket.[4] (Id.) The baggie held "29 clear [smaller] Ziploc baggies, 32 purple tinted flip-top containers, and then 49 red tinted flip-top containers," which, upon testing of their contents, were determined to be heroin/fentanyl and cocaine base/crack. (Id. at 118; see also Doc. No. 25 at 8.)

After pulling Defendant's pants up, Officer Smart "handed [Defendant] off to another officer to bring outside, and notified the other officers that he had narcotics in his front hoodie pocket." (Id. at 64, 113.) Officer Smart then joined other Officers to search for the firearm. (Id. at 64–65.)

### E. While Some Officers Search the Premises, Officer Fitzgibbon Conducts a Third Search of Defendant, Finding Cash

At approximately 6:01 p.m., Officers brought Defendant outside near a patrol car. (Tr. at 143.) At this point, Officer Patrick Fitzgibbon began interacting with Defendant, instructing him to spread his feet for a search before entering the patrol car. (Id. at 144.) Instead of spreading

---

[4] Officer Minissale also touched the baggie and "placed it back into [Defendant's] pocket . . . because [he] didn't have any gloves on." (Tr. at 114.) After another Officer took the baggie from Defendant's pocket, the narcotics "were sent to the PPD forensic chemistry lab for testing." (Doc. No. 25 at 8.)

his feet, Defendant attempted to sit down, asked to speak with either Officer Smart or a "white shirt,"[5] and shifted his body so that only his left side was pointed towards Officer Fitzgibbon. (Id. at 144–45.) Further frustrating Officer Fitzgibbons' attempt to search Defendant was Defendant's four layers of clothing over his legs, including underwear, compression pants, looser blue pants, and an outer-most layer of black pants. (Id. at 146.)

Ultimately, though, Officer Fitzgibbon was able to search Defendant's person, quickly finding cash in Defendant's left-side pockets. (Id. at 145.) However, when Officer Fitzgibbons' search continued to Defendant's buttocks area, Defendant said "you already did that . . . you're all in my ass." (Id. at 147.) After that remark, Officer Fitzgibbon stopped searching Defendant and placed him in the back seat of the patrol car. (Id.) Once Defendant was in the patrol car, Officer Fitzgibbon "went back in the store to assist" other Officers in their search for the firearm. (Id. at 148.)

### F. Officers Do a Final Search of Defendant After Reviewing the Store Camera, Finding the Firearm

Meanwhile, based on Defendant's earlier comments to Officer Smart that the gun was "in the back" and that Defendant "handed [it] off to somebody," Officer Smart searched (1) the remainder of the store, (2) the small outdoor area of the premises, and (3) the alleyway behind the store. (Tr. at 59, 64–65.) After several minutes of unsuccessful searches, Officers Smart and Minissale asked the store clerk for the store's surveillance video, but the clerk responded that he needed his "boss" to obtain that footage. (Id. at 65, 115.) Many Officers, including Officer Fitzgibbon, kept searching the premises for the missing firearm while waiting for access to the store's surveillance video. (Id. at 149.)

[5] "White shirts" are police officers in supervisory roles. (Tr. at 144.)

It took "potentially up to 30 minutes" for the Officers to obtain the surveillance footage, overcome technological issues with the time-stamps, and observe the relevant portions of the footage. (Id. at 116, 149.) After comparing the RTCC and the store's surveillance footage, the Officers determined the following:

> [Defendant] entered the first door into the vestibule area, then he entered the second door immediately, followed directly into the third door behind the cashier without going out anywhere else in the store or towards the back where he kept stating he did previously go.
>
> ***
>
> Due to realizing that he went nowhere else, did not place anything in any other areas, [Officer Minissale] was determined to do a second sweep of the offender to make sure that no contraband or firearms were still on his person.

(Tr. at 117). Consistent with this determination, Officer Fitzgibbon also concluded that his prior search of Defendant outside the store "wasn't adequate" and that Defendant "probably still had the firearm on him." (Id. at 70, 149–150.)

At this point, at approximately 6:33 p.m., Officers Fitzgibbon and Holbrook went back outside to perform another search of Defendant's person. (Id.) Officer Holbrook noticed that Defendant was "trying to avoid [Officer Fitzgibbon] from getting to his right side." (Id. at 165.) As a result, Officer Holbrook searched Defendant's right leg and felt a firearm between Defendant's thigh and his buttock area. (Id. at 150, 166.) A loaded black Stoeger, Model STR-9SC, nine-millimeter semiautomatic handgun was recovered between Defendant's skin and the first layer of Defendant's clothing. (Id. at 166.)

## III. CONCLUSIONS OF LAW

In Defendant's Motion to Suppress (Doc. No. 21), he contends that the four items recovered from the search—including the holster, narcotics, cash, and firearm—should be suppressed because that evidence was obtained in violation of Defendant's right not to be subject

to unreasonable searches and seizures under the Fourth Amendment. In this regard, Defendant makes three arguments:

1. The Officers lacked reasonable suspicion to stop Defendant in the store and conduct their initial frisk, which led to the recovery of the narcotics. As a result, all evidence later discovered was "fruit of the poisonous tree" and, thus, should be suppressed. (See Doc. No. 21 at 8–12.)
2. In the alternative, if the Court finds that the Officers had reasonable suspicion to search Defendant in the store, the Officers exceeded the appropriate scope of that search under Terry v. Ohio, 392 U.S. 1 (1968). (Doc. No. 21 at 12–13.)
3. In recovering narcotics, the Officers also violated the "plain view" doctrine by manipulating the contents of Defendant's hoodie pocket. (Id. at 13–15.)

In the Response in Opposition, the Government argues that the Officers had probable cause to arrest Defendant, and that all physical evidence was recovered during searches incident to a lawful arrest. (Doc. No. 25 at 9–16.) In the alternative, if the Court finds that the Officers lacked probable cause, the Government submits that reasonable suspicion existed to stop and frisk Defendant, and that the Officers' ensuing searches were appropriately limited in scope. (Id. at 16–25.) Finally, and also in the alternative, the Government argues that the doctrine of inevitable discovery applies to the physical evidence because—even if the evidence was unlawfully-obtained—the evidence would have been discovered through independent, lawful means. (Id. at 25–26.) For reasons that follow, Defendant's Motion to Suppress (Doc. No. 21) will be denied.

### A. Probable Cause Existed to Arrest Defendant

As noted above, the crux of the Government's argument is that the Officers had probable cause to arrest Defendant in the store. (See Doc. No. 25 at 9–16.) From there, the Government argues that the Officers' recovery of physical evidence was pursuant to a search incident to that lawful arrest, which is an exception to the warrant requirement under the Fourth Amendment. (See id.) In contrast, Defendant asserts generally that "there was no reasonable articulable suspicion to conduct the warrantless stop and subsequent frisk" because there was no way to ascertain whether Defendant was committing a criminal offense on the night of December 11, 2024. (Doc. No. 21 at 10.) The Court will first address whether probable cause existed to arrest Defendant in the store before addressing whether the four items were properly recovered pursuant to the search incident to a lawful arrest.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. It provides that this right "shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Id. Evidence obtained in violation of the Fourth Amendment may not be introduced at trial. See Davis v. United States, 564 U.S. 229, 232 (2011).

When making an arrest, an officer must have probable cause. United States v. Lanville, 480 F.3d 187, 194 (3d Cir. 2007) (citing Draper v. United States, 358 U.S. 307, 313 (1959)). The United States Supreme Court explained probable cause to arrest as follows:

> To determine whether an officer had probable cause for an arrest, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause. Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules. It requires only a probability or

> substantial chance of criminal activity, not an actual showing of such activity. Probable cause is not a high bar.

District of Columbia v. Wesby, 583 U.S. 48, 56–57 (2018) (internal quotations and citations omitted).

Here, viewing the totality of the circumstances from the standpoint of an objectively reasonable police officer, probable cause existed to arrest Defendant based on his unlawful possession of a firearm.[6] First and most importantly, the Officers were monitoring the zoomed-in RTCC when it showed the handgrip and rear-slide of a firearm protruding from Defendant's right side. Second, the Officers were capable of identifying that the visible handgrip and rear-slide were component parts of a handgun because (1) each Officer had at least five years of experience carrying firearms in their professional capacity (see Tr. at 45, 96, 136, 170), and (2) between the Officers, they had been involved in over 500 firearms investigations (see id. at 20, 97, 136). Based on the depth of their experience, it was objectively reasonable for the Officers to conclude from viewing the RTCC footage that a firearm was on Defendant's person.

In response, Defendant correctly notes that "a police officer may not infer criminal activity merely from an individual's possession of a firearm" in a place where it may lawfully be carried. (Doc. No. 21 at 5) (citing Commonwealth v. Hicks, 208 A.3d 916, 936–37 (Pa. 2019)). In this case, though, the Officers' recognition that Defendant was possessing a firearm in public was only one half of the probable cause equation. The other half of that equation was the Officers' "prior knowledge that [Defendant] [was] not permitted to carry a concealed firearm" under 18 Pa.C.S. § 6105. Hicks, 652 Pa. at 937. Relevant here, Officers Smart and Minissale credibly testified that

---

[6] As explained supra, Defendant was barred from possessing a firearm under 18 Pa.C.S. § 6105 due to his past felony convictions.

they (1) knew Defendant before December 11, 2024, (2) were aware of his prior felony convictions, and (3) understood that, based on that criminal past, he was prevented from carrying a firearm.[7] Based on the Officers' prior knowledge, Defendant's possession of firearm on the night of December 11, 2024—viewed plainly from the RTCC footage—the Officers reasonably concluded that there was probable cause that criminal activity was afoot, that is, Defendant's illegal possession of a firearm. See Wesby, 583 U.S. at 57. As a result, the Officers on the scene had probable cause to arrest Defendant in the store.[8]

### B. All Physical Evidence was Recovered Lawfully Through Searches Incident to Arrest

Generally, warrantless searches are presumed to be unreasonable, and suppression of all evidence obtained from an unreasonable search is the appropriate remedy. See United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995) (citing Cady v. Dombrowski, 443 U.S. 433, 439 (1973)). But, as noted earlier, a search incident to a proper custodial arrest is an exception to the general warrant requirement. See Riley v. California, 573 U.S. 373, 382 (2014). The United States

---

[7] As noted above, the body camera footage not only shows Officer Minissale referring to Defendant by his first and last name without Defendant identifying himself, (Tr. at 113), but also Defendant referring to Officer John Smart as "Smart" without Officer Smart identifying himself. (See, e.g., id. at 145.) Moreover, Officers Smart and Minissale testified that they were "personally involved" in the prior arrests that led to Defendant's felony convictions. (Id. at 40, 104.) As a result of these prior interactions with Defendant, Officer Smart testified that he knew Defendant was a "6105 prior," and Officer Minissale testified that Defendant "wasn't allowed to have any possession of a firearm." (Id. at 40, 104.)

[8] Officer Fitzgibbon testified that his probable cause determination derived from Officers Smart and Minissale's knowledge of Defendant's criminal history. (See Tr. at 140.) Officer Holbrook did not testify as to how he concluded that probable cause existed to arrest Defendant. However, under the collective knowledge doctrine, "the knowledge of some members of law enforcement may be imputed to others to support a finding of reasonable suspicion or probable cause." United States v. Willis, No. 23-cr-353, 2024 WL 2158253, at *4 (E.D. Pa. May 14, 2024) (citing United States v. Whitfield, 634 F.3d 741, 744 (3d Cir. 2010)). As a result, all four Officers who testified had probable cause to arrest Defendant.

Supreme Court has held that an arresting officer conducting a search incident to an arrest may search the "arrestee's person and the area 'within his immediate control.'" Id. at 383 (citing Chimel v. California, 395 U.S. 752, 762–63 (1969)). As the Court held in Chimel,

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.... There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

395 U.S. at 762–63.

In the present case, four items were recovered as evidence: the holster, narcotics, cash, and firearm. The Court will address the seizure of each in turn.

**1. Holster**

The first item that the Officers recovered from Defendant was a gun holster. Though not entirely clear from the footage, it appears Officer Smart was conducting an initial pat-down of Defendant when he recovered the holster "from the area [he] observed" on the RTCC video. (Tr. at 54–55) (Officer Smart explaining that his body-worn camera "went black" as he recovered the holster because the camera was "in center of my chest right here. So, when I'm going hands-on with the Defendant, it's directly on his back.").

The Supreme Court has noted that the search incident to arrest exception to the warrant requirement "derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." Arizona v. Gant, 556 U.S. 332, 339 (2009). When those safety and evidentiary concerns no longer exist, the search incident to arrest exception will no longer apply. See United States v. Shakir, 616 F.3d 315, 321 (3d Cir.

2010). However, if those interests are still implicated, an officer may search the "arrestee's person and the area 'within his immediate control.'" Riley v. California, 573 U.S. at 383 (citing Chimel v. California, 395 U.S. 752, 762–63 (1969)).

In this case, the search incident to a lawful arrest exception permitted the Officers to search Defendant's person and the area within his immediate control to eliminate threats to their safety and to preserve evidence of the alleged crime they witnessed Defendant commit on the RTCC. The officer safety and evidence preservation justifications underlying the exception were, given the facts here, quite on point. Notably, the Officers had just seen Defendant carrying a firearm on his right side one minute before they entered the store. Additionally, their ensuing search was within the bounds of a proper search incident to arrest; Officer Smart recovered the holster on Defendant's person—specifically, on Defendant's right side where he had just witnessed Defendant carrying the firearm. Because the search of Defendant incident to his lawful arrest justified the recovery of the holster, it will not be suppressed.

**2. Narcotics**

The second item recovered was a "sandwich baggie" holding "29 clear Ziploc baggies, 32 purple tinted flip-top containers, and then 49 red tinted flip-top containers," which were later confirmed to contain various narcotics. (Tr. at 118; see also Doc. No. 25 at 8.) After securing Defendant in handcuffs and recovering the holster, Officer Smart resumed his pat-down of Defendant to secure the firearm. (Tr. at 57–58.) Part of that search involved patting down Defendant's front hoodie pocket. (Id. at 58.) When doing so, Officer Smart felt the sandwich baggie and "immediately" believed it "was containing very tiny flip-top containers that are used to package crack cocaine." (Id. at 58–59.) Officer Smart then recovered the baggie. (Id. at 60.)

Defendant contends that the discovery of the narcotics violated his Fourth Amendment rights because (1) the Officers' suspicion that "the Defendant was armed and dangerous should have been dispelled" when they only recovered an empty holster, and (2) the narcotics were not recovered pursuant to the "plain view" exception to the warrant requirement. (Doc. No. 21 at 12–15.) The Court will address each argument below.

First, Defendant notes that once the Officers had failed to recover a firearm during their initial pat-down, "the pat down should have ceased." (Id. at 14.) As stated above, when the interests of officer safety and preservation of evidence are no longer relevant, the search incident to arrest exception no longer applies. See Shakir, 616 F.3d at 320–21. But, under the totality of the circumstances, when "there remains a reasonable possibility that the arrestee could access a weapon or destructible evidence in the container or area being searched," the search incident to arrest exception will still apply. Id. (noting that the "reasonable possibility" requirement "remains a lenient standard.").

Here, there was still a reasonable possibility that Defendant could access a weapon. Despite the Officers not finding a firearm in their initial search, the location of the firearm they had seen on the RTCC remained unresolved. And contrary to Defendant's assertion, the initial discovery of an empty holster during a brief initial pat-down did not dispel safety concerns—it only confirmed and heightened them due to the threat of a missing firearm and the realization that it may be in close proximity to them. (See Tr. at 63) (Officer Smart noting "[i]t's a safety issue when we observe somebody with a firearm and then that firearm is no longer on that person."). Moreover, when asked by the Officers where the firearm was, Defendant did not deny that he was carrying a firearm before the Officers arrived, but told Officers that he had discarded the firearm somewhere in the store. (Id. at 59, 64.) Therefore, the search initially conducted

incident to arrest was lawfully carried out and permitted the Officers to search Defendant's person after he was handcuffed. See Shakir, 616 F.3d at 320–21 (holding that there was "a sufficient possibility" that a defendant—even in handcuffs and surrounded by two police officers—could access a weapon in a bag that was at his feet); United States v. Muldrow, No. 20-cr-14, 2020 WL 6445952, at *12 (E.D. Pa. Nov. 3, 2020) ("While it would have been difficult for [a handcuffed defendant] to reach the contents of his front [hoodie] pocket, we do not consider this possibility 'remote enough to render unconstitutional the search incident to arrest.'").

Second, the Government contends that the Officers lawfully recovered the narcotics under the "plain feel" doctrine. (Doc. No. 25 at 24–25.) Defendant notes that the recovery was unlawful because Officer Smart had to manipulate the baggie to ascertain that it contained incriminating evidence.[9] (Doc. No. 21 at 13.)

The "plain feel" doctrine allows police to "seize contraband during a lawful pat-down if the contraband's 'contour or mass makes its identity immediately apparent.'" United States v. Greene, 927 F.3d 723, 726 (3d Cir. 2019) (citing Minnesota v. Dickerson, 508 U.S. 366, 375 (1993)). Importantly, the officer must develop probable cause to believe it is contraband "by the time he concludes it is not a weapon." Id. (citing United States v. Yamba, 506 F.3d 251, 257, 259 (3d Cir. 2007)).

Here, Officer Smart testified that, upon feeling the front hoodie pocket in his search for the firearm, he "immediately" believed that the baggie contained narcotics. (Tr. at 59.) His testimony is credible for two reasons. First, the body-worn camera shows that Officer Smart

[9] Defendant's Motion largely relies on the "plain view" doctrine, but the body-worn camera footage demonstrates that the Officers recovered the narcotics based on their "plain feel" of the packaging. (See Tr. at 59.) Therefore, the Court will analyze the constitutionality of Officer Fitzgibbon's recovery of the narcotics based on the applicability of the "plain feel" doctrine.

only had his right hand on Defendant's hoodie pocket for a few seconds before concluding that the hoodie was being weighed down not by a gun—but by a baggie full of narcotics. Second, due to participating in over 200 narcotics investigations throughout his career, Officer Smart had extensive knowledge of narcotics and how they are packaged. (See Tr. at 20.) By the time that he determined no weapon was present in the pocket, Officer Smart developed probable cause that he was feeling packaging that contained narcotics. As a result, his recovery of the baggie satisfied the plain feel doctrine, and the baggie will not be suppressed. See United States v. Graves, 877 F.3d 494, 500 (3d Cir. 2017) (finding that the "feel of crack cocaine," the officer's "experience with narcotics investigations," and the fact that the officer "had yet to determine whether [defendant] was armed at the time he felt the objects" satisfied the plain feel doctrine); Greene, 927 F.3d at 726–27 (holding that an experienced officer's immediate identification of narcotics during a lawful pat-down satisfied the "plain feel" doctrine).

**3. Cash**

The third item that the Officers recovered from Defendant was $1,245 in cash. (Doc. No. 21 at 7.) After Officer Smart found narcotics on Officer Smart, he joined other Officers in searching the store for the then missing firearm. (Tr. at 64–65, 113.) Meanwhile, Defendant was taken outside the store, prompting Officer Fitzgibbon to initiate another pat-down before putting him in the back of a squad car. (See id. at 143–44, 147.) However, as he attempted to sit down, Defendant's behavior turned uncooperative and he requested to speak with other Officers. (Id. at 144–45.) Defendant also shifted his right side away from Officer Fitzgibbon. (Id.) When Officer Fitzgibbon was finally able to search Defendant, he found cash in one of his left-side pants pockets. (Id. at 145.)

In his Motion, Defendant does not explicitly challenge Officer Fitzgibbon's search of Defendant that revealed the cash. Instead, his basis for suppression for the cash is the "fruit of the poisonous tree" doctrine. (Doc. No. 21 at 8.) According to Defendant's argument, because there was no reasonable suspicion or probable cause to conduct an initial stop and frisk of Defendant, all physical evidence recovered from subsequent searches, including the cash, must be suppressed. (See id. at 8–12.) But probable cause to arrest Defendant had already been established, so the "fruit of the poisonous tree" doctrine does not apply here. And the search incident to arrest exception will apply so long as "there remains a reasonable possibility that the arrestee could access a weapon or destructible evidence in the container or area being searched." See Shakir, 616 F.3d at 320–21.

Here, Officer Fitzgibbon first encountered Defendant after he was taken outside. (Tr. at 143.) Other Officers informed Officer Fitzgibbon that they had seen Defendant possessing a firearm. (Id. at 140.) Because there was still "reasonable possibility" that Defendant could access a weapon, Officer Fitzgibbon's search of Defendant's person before placing him in the squad car was done in accordance with the search incident to arrest exception. See Muldrow, No. 20-cr-14, 2020 WL 6445952, at *12 (collecting Third Circuit caselaw standing for the proposition that a defendant in handcuffs still can access a weapon on or near his person). Therefore, the $1,245 in cash seized from Defendant will not be suppressed.

**4. Firearm**

The final item that the Officers recovered from Defendant was the firearm. After searching the premises of the corner store and even portions of the outside area, Officers reviewed the surveillance video given to them by the store clerk. (Tr. at 65, 115–16, 149.) Upon review of the surveillance footage, they realized that Defendant had entered the store

and proceeded directly to the clerk area behind the register. (Id. at 117, 149.) The footage belied Defendant's previous assertion that the gun "was in the back" or that he handed it off to another person in the store. (Id. at 59.) As a result, the Officers concluded that Defendant may still have the gun on his person, so Officers Fitzgibbon and Holbrook conducted another search of Defendant outside of the patrol car and found the firearm on his right side under his clothing. (Id. at 150, 166.)

Defendant's sole basis for suppression of the firearm is that it was recovered as "fruit" of the initial unconstitutional stop. (See Doc. No. 21 at 8–12.) Similar to the Officers' recovery of cash, the Officers' recovery of the firearm does not implicate the "fruit of the poisonous tree" doctrine because the Officers had probable cause to arrest him. Therefore, the search incident to arrest exception applied so long as "there remain[ed] a reasonable possibility that the arrestee could access a weapon or destructible evidence in the container or area being searched." See Shakir, 616 F.3d at 320–21.

Because the video footage demonstrated Defendant was likely still in possession of the firearm and that he had misrepresented the firearm's whereabouts to the Officers, there remained "a reasonable possibility" that Defendant still possessed the firearm they had seen him with on the RTCC.

Finally, because there was probable cause to arrest Defendant, there is no need to discuss whether the Officers had only reasonable suspicion to "stop and frisk" Defendant and then exceeded the permissible bounds of a search under this standard. Probable cause is a more rigorous standard to meet than reasonable suspicion, and probable cause was

shown to exist here by the Government's evidence. As a result, the firearm will not be suppressed.[10]

## IV. CONCLUSION

This case is the quintessential one on why a search of a person incident to a lawful arrest based on probable cause may be extended beyond the initial search. The Officers knew that a gun was in the vicinity and Defendant was not truthful about its location. This resulted in an extensive search for the firearm in the store and the surrounding area in part based upon Defendant's misrepresentation. Thus, under all the circumstances here, it was prudent for the Officers to conclude that the firearm may still be on Defendant's person. The subsequent search

---

[10] The Government also submits in the alternative that all four items—even if "illegally obtained"—would have been recovered under the inevitable discovery doctrine. (Doc. No. 25 at 25–26.) Specifically, the Government contends that the evidence "would have inevitably been discovered at the police station during processing." (Id. at 26.)

Under the inevitable discovery doctrine, the Government must show by a preponderance of the evidence "that the [unlawfully-obtained] evidence at issue would have been acquired through lawful means, a burden that can be met if the government establishes that the police, following routine procedures, would inevitably have uncovered the evidence." United States v. De Reyes, 149 F.3d 192, 195–96 (3d Cir. 1998) (noting that "courts must take care to hold the government to its burden of proof.").

As explained above, the Officers had probable cause to arrest Defendant. Had the Officers not conducted on-the-scene searches that produced the holster, narcotics, cash, and firearm, the Government may have recovered them later. However, the Government still bears the burden of showing that the inevitable discovery doctrine applies. The Government's Response in Opposition briefly states the evidence would have been recovered during processing, but fails to (1) refer to any PPD policy or practice for searching arrestees during processing, or (2) provide testimony on the matter at the August 11, 2026 hearing. See Muldrow, No. 20-cr-14, 2020 WL 6445952, at *13 (relying on testimony from an officer when determining the applicability of the inevitable discovery doctrine); United States v. Matthews, No. 09-cr-612, 2010 WL 2671388, at *6 n.6 (E.D. Pa. July 1, 2010), aff'd, 532 F. App'x 211 (3d Cir. 2013) (relying on PPD policy submitted by the Government and testimony from officers to find that items would have been inevitably discovered at the station). As a result, the inevitable discovery doctrine does not provide an alternative means here for denying Defendant's Motion to Suppress. Regardless, because the four items were recovered under a proper search incident to arrest, they will still be admissible at trial.

of him resulted in recovery of the firearm, which concluded an investigation that lasted over thirty (30) minutes.

Accordingly, for the foregoing reasons, the Court will deny Defendant's Motion to Suppress All Physical Evidence Recovered Pursuant to the Search and Seizure of the Defendant. (Doc. No. 21.) The holster, narcotics, cash, and firearm are admissible at trial. An appropriate Oreder follows.